[Civ. No. 30889. Second Dist., Div. Three. Apr. 24, 1968.]

NEAL D. HOUGHTON, Plaintiff and Appellant, v. KERR GLASS MANUFACTURING CORPORATION, Defendant and Respondent.

Forster, Gemmill & Farmer and James H. Knecht, Jr., for Plaintiff and Appellant.

Johnson, Robertson, O'Sullivan & Ladenberger and Don A. Ladenberger for Defendant and Respondent.

COBEY, J.—This is an appeal from a judgment in a declaratory relief action declaring that the defendant-employer is not obligated to pay the plaintiff-employee $20,000. The case is concerned with the meaning of paragraph 7 in a letter contract of employment drawn by the employer and accepted in writing by the employee which letter confirmed a previous oral agreement between the parties.

This paragraph read as follows: "7. In the event the company decides to discontinue the plastic [sic] division, you will be guaranteed one year's basic salary in advance at. time of termination." The basic salary was $20,000.

Plaintiff went to work for defendant on June 19, 1961, as general manager of its new plastics division. Aside from financial matters, he was in complete charge of all aspects of setting up and getting the new division into operation. The new division began production about March of 1962 but did not prove profitable. On January 4, 1965, its operating assets and all of its employees, including plaintiff, were transferred by defendant to the Continental Can Company without any interruption in their employment or pay.[1] During the following month plaintiff demanded that defendant pay the $20,000 called for in paragraph 7. Defendant refused the demand and this litigation ensued.

Throughout this case defendant's position has been that,

---

[1] Plaintiff has received the same salary from Continental as defendant paid him. However he has been transferred to Chicago, has moved there with his family, and the standing and the responsibilities of his employment have been reduced.

properly construed, paragraph 7 required it to pay plaintiff $20,000 upon the discontinuance of its plastics division only if by reason of such discontinuance plaintiff lost his job and became unemployed. Since in this case plaintiff did not suffer such loss of employment, but merely involuntarily changed employers, defendant claims that no liability arose under paragraph 7.

Plaintiff's position, of course, has always been otherwise. His claim has been that the requirement in paragraph 7 of the payment to him of $20,000 ''in advance at time of termination'' plainly meant that this sum was to be paid to him at the time of the termination of his employment by defendant regardless of what thereafter happened to him with respect to employment.

The trial court admitted extrinsic evidence upon the meaning of paragraph 7. Both plaintiff and the man who hired him, defendant's vice-president for finance, William A. Kerr, testified upon the meaning of this paragraph to the parties to the agreement. Plaintiff introduced extrinsic evidence to the effect that when the agreement was being negotiated he advised defendant's negotiator, one Jack Pettker (deceased at the time of the trial), that he ''wanted some kind of a protection against the sort of thing that just happened to me when Celanese bought Royal.''[2]

Plaintiff also testified, without objection, that the language of paragraph 7, from its inception, meant the following to him. ''A. Well, the language seemed to me to give me the assurance that I wanted on all counts as far as not being—if the business should be sold, as it turns out it was—assets transferred, however you want to call it—then I would have sufficient income that I wouldn't have to go along like a peon of the business. I could have a choice of what I might do. Also gave me protection against the other eventuality that if business would turn out to be so profitless that they wanted to get out of it, I would still be left with some continuing income to find more employment. So far as I could see it answered all my requirements.''

Thereafter in the trial, over plaintiff's objections, defendant introduced into evidence as its Exhibit B, a preliminary handwritten memorandum concerning the agreement. This

[2] When Celanese bought out plaintiff's former employer, Royal, although Celanese raised plaintiff's salary and kept him at his former location, it reduced materially the prestige and responsibilities of his position.
terminate the trust.''

memorandum had been prepared by Kerr and had been given to defendant's negotiator, the aforementioned Pettker, as a work sheet for what was apparently his last conversation with plaintiff. In the course of this conversation Pettker handed this preliminary memorandum to plaintiff.

In relevant part this memorandum reads as follows: "Possible 1 year termination notice with pay or 1 year's salary if company decided to discontinue in plastic [*sic*] business."

The following colloquy occurred with respect to the introduction of this exhibit. "Q By MR. LADENBERGER [defendant's counsel]: Mr. Houghton, I show you a document which has been marked Defendant's B for identification and ask you if that is the document to which you have just referred as having been handed you in Prescott by Mr. Pettker? MR. KNECHT, JR.: Your Honor, this may be premature but I would rather be on the premature side. I am going to object to any further testimony in connection with this document on the grounds that it tends to vary or may tend to vary or add to the terms of the contract that has already been placed in evidence and, therefore, would fall within the parol evidence rule. THE COURT: Well, parol evidence rule is one that requires difficulty of application in these cases where contracts are not, oh, enormously detailed and spelled out. We admit these notes and the conversations and the circumstances of the parties not for the purpose of showing a different agreement than the one set down in the letter of May 23 but for the purpose of showing what the people had in mind or might have had in mind when they used the particular phraseology that they did in the letter of May 21. So all these circumstances will be admitted not for the purpose of showing a different agreement but to show what the people meant. Overruled. That is the general course of the decisions in the last 10 or 15 years on the parol evidence rule. Do you want to admit it in evidence after my speech? MR. LADENBERGER: I believe I will, Your Honor. THE COURT: The same thing applies—this is just another circumstance. MR. KNECHT, JR.: I will object to the admission of the memorandum in evidence at this time because I don't think there is proper foundation for it laid yet at all. THE COURT: It was a note or memorandum given by an authorized representative of the other side to your man. That memorandum, plus his reaction thereto, would be a circumstance. Remember, we are not putting it in to change the clause. We are putting it in to show what they meant, if anything. Now, maybe it has no significance I don't know. MR. KNECHT, JR.: Very well, Your Honor."

In addition to the admission of Exhibit B in evidence, Kerr was permitted, over plaintiff's objection, to testify as to oral instructions he gave Pettker with respect to that part of Exhibit B which ultimately became paragraph 7. This portion of the record is as follows. "Q. In regard to the notation, last notation on Defendant's Exhibit B, what instructions, if any, did you give to Mr. Pettker in regard to that? A. I had told him that a request of this type was not an ordinary thing with us. In fact, with other people that we had hired previously none had ever asked for such an arrangement. Mr. Pettker had expressed to me that what Mr. Houghton was primarily interested in was job protection. This was a— MR. KNECHT, JR.: Your Honor, I object— THE COURT: Goes to his state of mind. See, I permitted your client, Mr. Houghton, to testify what his intention and understanding was. So I am going to do the same thing here. This is just another way of doing it. Your man could do the same thing. What did Pettker tell him? That goes to his state of mind. Pettker's gone. I realize we can't use his statements as proof of the truth of what he said but showing the state of mind of the people who were at the other end is the only way we can do it. I am going to base it on that ground, either one of you. Overruled. You may go ahead. THE WITNESS: Mr. Pettker had expressed to me that what Mr. Houghton was interested in was job protection. That the Plastic Division was to be a new operation with us. He didn't want us to decide after a short period of time that we didn't like the business and would shut it down, stop the complete operation and put him out on the street without a job. So I felt it was only reasonable to give him protection of this type, and this is the basis upon which this item 7 was included in the letter."

Finally there was introduced into evidence, over plaintiff's objection, defendant's Exhibit D, another handwritten memorandum by Kerr. This memorandum purported to state the substance of a telephone conversation between Pettker and Kerr in which Pettker first informed Kerr of plaintiff's requirements regarding what subsequently became the subject matter of paragraph 7.

This memorandum in its entirety read as follows. "Per phone with Jack Pettker—He advised of conv. with Neal H. re empl. Neal asked for a ltr. outlining the term of empl. He wants in addit to other things we have offered him a statement that if we decide to shut down the plt because we dont like the business or for some other reason that he wont be out

of a job. Would like a guarantee of 1 yr. basic salary in advance in event we close it and he is out of a job. Didn't want to give up employment he had for a new venture without this and find himself out of a job after only a short period of a couple of years. Adv. Jack I would send a letter.''

The following colloquy occurred just prior to its introduction in evidence: "MR. LADENBERGER: The second was Defendant's D, Your Honor, which is the second memorandum prepared in Mr. Kerr's handwriting that we just referred to in testimony with him. THE COURT: What was the purpose of putting that in? MR. LADENBERGER: To show the state of mind as discussed earlier with Your Honor, that Mr. Kerr in relation to Mr. Houghton— THE COURT: Same reason I let the plaintiff show what his intention was, for what value it has in reflecting the state of mind of either one of these fellows. That is the sole purpose. You have your objection. MR. KNECHT, JR.: I will object on the grounds that it is contrary to the parol evidence rule and, Your Honor, while I am at it,— THE COURT: Overruled.''

 On this record the trial court accepted defendant's version of the meaning and effect of paragraph 7 as being "within the reasonable commercial expectation of the parties.''

In so doing, we believe the trial court committed reversible error because there was no substantial evidence to support the interpretation it adopted. It is true that, generally speaking, extrinsic evidence was properly admitted in this case pursuant to certain exceptions to the parol evidence rule found in Code of Civil Procedure, sections 1856 and 1860— namely, evidence of circumstances under which the agreement was made, including the situation of the subject of the agreement and of the parties to it. (See *Kurland* v. *United Pac. Ins. Co.*, 251 Cal.App.2d 112, 115 [59 Cal.Rptr. 258].)

 Extrinsic evidence is admissible to give to an agreement any meaning to which it is reasonably susceptible. (*Coast Bank* v. *Minderhout*, 61 Cal.2d 311, 315 [38 Cal.Rptr. 505, 392 P.2d 265]; *Roberts* v. *Reynolds*, 212 Cal.App.2d 818, 825 [28 Cal.Rptr. 261].) We are not prepared to say that the meaning which the trial court and defendant gave to paragraph 7 is a meaning to which it is not reasonably susceptible.

 But the only extrinsic evidence offered in support of this interpretation of paragraph 7 was the above quoted testimony of Kerr as to certain oral instructions he gave defendant's negotiator, Pettker, and defendant's Exhibit D, Kerr's

handwritten memorandum of a telephone conversation he had with Pettker during the negotiations between the parties.[3]

There is nothing in the record to indicate in any way that these understandings of Kerr with respect to plaintiff's intention regarding what thereafter became the subject matter of paragraph 7 were ever communicated to plaintiff. Under these circumstances they amount to nothing more than statements of Kerr as to what he then personally believed plaintiff wanted or intended with respect to what thereafter became the subject matter of paragraph 7.

██ It has long been a settled principle of contract law that the *intention* of a party to a bilateral agreement *which is undisclosed and uncommunicated to the other party* is, in the absence of mistake or fraud, *immaterial* under the objective theory of contract. (*Brant* v. *California Dairies, Inc.*, 4 Cal.2d 128, 132-133 [48 P.2d 13]; *Ribiero* v. *Dotson*, 187 Cal.App.2d 819, 821 [9 Cal.Rptr. 909]; *Schmitz* v. *Wetzel*, 188 Cal.App.2d 210, 212 [10 Cal.Rptr. 219]; 3 Corbin, Contracts (1960) § 538, pp. 57-58.) The fact that here the evidence consists of what one party said it understood the other party's intentions to be, rather than the more common situation of a direct statement of that party's intentions, seems to us to be immaterial. (Cf. *Ribiero* v. *Dotson, supra*; Res., Contracts, § 71.) The rule prohibits this type of evidence regardless of the form in which it is offered.

██ Furthermore, independently of the foregoing, we are of the opinion that the extrinsic evidence under discussion was admitted in violation of the parol evidence rule as developed by the case law. When the parties to a written agreement, as here, have agreed to it as an integration—a complete and final embodiment in writing of that to which they have agreed—extrinsic evidence cannot be used to add to or to vary its terms. (*Masterson* v. *Sine*, 68 Cal.2d 222, 225 [65 Cal.Rptr. 545, 436 P.2d 561].) Statements by the parties of what they intended the meaning of the integration to be are not admissible to interpret the integration. (See

---

[3]Defendant also introduced into evidence, over objection, as its Exhibit A, a copy of plaintiff's employment contract with the aforementioned Celanese Corporation of America to show that plaintiff had not notified Celanese of a change in employment from defendant to Continental as required by the Celanese contract. We doubt whether this exhibit should have been admitted in evidence but in any event proof of plaintiff's breach of the Celanese contract in this respect provides no support for the trial court's interpretation of paragraph 7 that only a discontinuance of defendant's plastics division resulting in unemployment for the plaintiff was covered by the paragraph.

Rest., Contracts, §§ 235(d), 230[4] com. a; 9 Wigmore, Evidence (3d ed. 1940) § 2471, pp. 229-230; *Imbach* v. *Schultz*, 58 Cal.2d 858, 860 [27 Cal.Rptr. 160, 377 P.2d 272]; *Brant* v. *California Dairies, Inc., supra,* 4 Cal.2d 128, 133; 3 Corbin, Contracts (1960) § 543, pp. 135-138.)

The rationale of this exclusionary rule would appear to be that such statements of intention are apt to be entirely self-serving and therefore untrustworthy. Again, we see no reason why this rule of exclusion should not apply even though the statements of intention are couched in the form of one party's understanding of the intentions of the other party.

Objection was made by plaintiff to the introduction of defendant's Exhibit D on the ground that such introduction violated the parol evidence rule. The basis of plaintiff's objection to the introduction of Kerr's oral testimony as to his understanding of plaintiff's desires was never stated. But in view of the fact that plaintiff's counsel was cut off by the trial judge, to whom the case was being tried, before he could state the basis for his objection to this testimony, we believe that plaintiff's counsel was excused from doing so. (Cf. Witkin, Cal. Evidence (2d ed. 1966) § 1313, p. 1213.) Moreover, since in our view both defendant's Exhibit D and Kerr's quoted testimony were immaterial, no objection to the introduction of either of them was necessary. (See *Kitchel* v. *Acree,* 216 Cal.App.2d 119, 124 [30 Cal.Rptr. 714]; Witkin, *supra,* § 1308, pp. 1209-1210.)

Defendant argues that we should not discard its evidence in support of the judgment because the introduction of that evidence was occasioned by the earlier erroneous admission, without objection, of plaintiff's own testimony as to his intention. But this explanation of why defendant offered this evidence does not change its inadmissible character and transform it into substantial supporting evidence.

The judgment is reversed.

Ford, P. J., and Moss, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 19, 1968.

---

[4]In its express terms section 230 keeps out *oral* statements by the parties of what they intended the integration to mean. Exhibit D purports to be a written memorandum of an oral conversation between Pettker and Kerr with respect to the plaintiff's intentions. Therefore, regardless of the fact that such oral statements were reduced to writing and it is the writing that was offered in evidence, we believe Exhibit D comes within the terms of section 230.